T. B. SCOTT LUMBER COMPANY, Respondent, vs. HAFNER-LOTHMAN MANUFACTURING COMPANY, Appellant.

*December 2 — December 17, 1895.*

*Sale of chattels: Lumber sold "pile run" or "on grades"? Contract construed: Implied warranty: Refusal to accept: Measure of damages: Resale: Evidence.*

1. By a written order and its acceptance defendant agreed to buy and plaintiff agreed to sell a certain quantity of lumber, "piled for C select and better" and "for shop and flat," and being then in plaintiff's mill yard; and it was provided that "worthless mill cull lumber is not to be accepted on this order." Before the contract was made there had been some discussion as to whether the sale should be made "pile run" or strictly "on grades," and de-

T. B. Scott Lumber Co. vs. Hafner-Lothman Mfg. Co.

fendant's agent had to some extent inspected the lumber in the piles, and defendant had received two car loads of it on a previous order. *Held*, that the contract did not call for lumber strictly of the grades mentioned, but for the specified quantity, "pile run," from the piles in plaintiff's yard, exclusive of worthless mill culls.

2. The defendant in such case having had a fair opportunity for inspection, and there having been no fraud, there was no implied warranty that the lumber should be merchantable for defendant's use at its factory.

3. In an action for damages for a vendee's refusal to accept goods as agreed in his contract of purchase, the measure of damages is the difference between the contract price and the market value of the goods at the time of the breach.

4. The price obtained upon a resale made within a reasonable time is evidence of the market value, and if it appears that all reasonable efforts were made to secure the best price obtainable, or that the price obtained was a fair one, it settles the question of such value; but where the evidence as to the resale is not definite the court need not be governed by it.

APPEAL from a judgment of the circuit court for Lincoln county: CHAS. V. BARDEEN, Circuit Judge. *Affirmed.*

The plaintiff was a lumber manufacturer and dealer. It had in its yards at Merrill, Wis., a quantity of lumber piled for the classes known as "C select and better," and "shop and flat." Mr. Green, an employee of defendant having authority to examine and negotiate for the purchase of lumber, visited plaintiff's place of business on behalf of defendant, and made a casual examination of the lumber referred to, a small amount being taken from the piles for that purpose. He wanted to make a purchase on behalf of his company on grades, but was informed plaintiff desired to sell "pile run." At this time two car loads of the lumber were ordered, and thereafter shipped to the defendant, and unloaded and examined at its yards in Oshkosh. Thereafter, and about two weeks after Mr. Green's visit to plaintiff's yards, and without any knowledge of the lumber except what was then obtained and the examination of the car loads referred to, a

contract was made between plaintiff and defendant as follows:

"Oshkosh, Wis., Jan. 16th, 1892.

"*T. B. Scott Lumber Co., Merrill, Wis.*

"DEAR SIRS: Please ship the following lumber to Foster-Hafner Mills at this city, and invoice the same to *Hafner-Lothman Manufacturing Company* of St. Louis, Mo., in duplicate to this office, viz.:

"200,000 feet 1¼ inch, piled for C select and better, to be thick enough to S. 2 S. 1⅛ inch.

"275,000 feet 1½ inch, piled for C select and better, to be thick enough to S. 2 S. 1⅜ inch.

"25,000 feet 2 inch, piled for C select and better, to be thick enough to S. 2 S. 1¾ inch.

"230,000 feet 1¼ inch, piled for shop and flat, to be thick enough to S. 2 S. 1⅛ inch.

"1,880,000 feet 1½ inch piled for shop and flat, to be thick enough to S. 2 S. 1⅜ inch.

"180,000 feet 2 inch, piled for shop and flat, to be thick enough to S. 2 S. 1¾ inch.

"In all, 2,790,000 feet. Total at the uniform price of $21.25 per M. feet, f. o. b. cars here. All the above lumber to be of the cut of 1891, and now being in piles at your mill-yard premises at Merrill, Wis. And begin shipping the above lumber on or before January 20th, 1892, and the final shipment to be made not later than June 1st, unless by mutual consent. We will make payments for the same as follows, viz.: All the lumber shipped on this order during each of the months of January, February, March, April, and May, 1892, shall be considered as shipped on the last days of these months, and we will give our acceptance at sixty days on the last day of each month for the total amount of the shipment of each of the said months; it being understood that we do not have the privilege of the usual cash discount, unless by your consent. It also being understood

that worthless mill cull lumber is not to be accepted on this order.

"The above order is accepted for the *T. B. Scott Lumber Company* by Z. J. Graham.

"HAFNER-LOTHMAN MFG. CO.,<br>"*Per* C. FOSTER, V. Pres."

Thereafter, during the months of January, February, and March, plaintiff shipped, under the contract, seventy-four car loads, sixty-eight of which were received and unloaded by defendant, and the balance rejected, which plaintiff was obliged to ship to Milwaukee for sale. On the 26th day of March, 1892, defendant notified plaintiff that it would not receive any more lumber, and thereupon plaintiff notified defendant that it would proceed to resell the remainder on the best terms obtainable, and hold defendant liable for the loss.

Plaintiff claims that the lumber was purchased as piled in the yard at the prices stipulated in the contract. Defendant claims that it purchased strictly on grades, viz. "C select and better," and "shop and flat," and that, as plaintiff insisted on shipping on the theory that the purchase was made pile run, worthless mill culls only excepted, it had a right to rescind the contract, which it did. The trial court found in plaintiff's favor, and awarded $50 for extra expense of selling lumber shipped to Milwaukee; and $1 per thousand on all lumber not shipped up to the time of defendant's refusal, as damages. Judgment was rendered in plaintiff's favor, from which this appeal was taken.

For the appellant there was a brief by *Bouck & Hilton,* and a separate brief signed by *Barbers & Beglinger,* and oral argument by *Charles Barber* and *Gabe Bouck.*

*W. C. Silverthorn* and *Geo. Curtis, Jr.,* for the respondent.

MARSHALL, J. There are three questions only presented on this appeal, and they will be considered in their order.

1. Was it intended that the respondent should sell and appellant should buy lumber to the amount designated in

the contract, to be taken from the piles in respondent's yards, rejecting only worthless mill culls?

The intent of the parties at the time of making the contract must govern, and that must be sought out from the instrument itself. The question is, What is the meaning of the words used? *Weiseger v. Wheeler,* 14 Wis. 101; *Farmers' L. & T. Co. v. Comm. Bank,* 15 Wis. 424; *Johnson v. N. W. Nat. Ins. Co.* 39 Wis. 87. This is subject, however, to another rule,— that, if the terms of the contract are uncertain, resort may be had to the situation of the parties and the circumstances at the time of making the contract, to enable the court to determine the proper construction to be given to it. *Nilson v. Morse,* 52 Wis. 240. Now, the instrument in question, though in the form of an order accepted, constitutes a written contract, subject to all the rules governing such instruments. Defendant agreed to buy and plaintiff agreed to sell a certain amount of lumber, "piled for C select and better," and "for shop and flat." Now, it is a rule of construction, to be observed, that the contract should be so construed, if possible, as to give effect to all its parts. *Jacobs v. Spalding,* 71 Wis. 177. The words, "piled for C select and better," and "for shop and flat," are significant. They were not inserted without some definite purpose. If the lumber was sold strictly on grades, as defendant claims, then no effect is to be given to those words whatever. We think that, considering the words in connection with the circumstance that before the contract was made there was some discussion over whether the sale should be made "pile run" or strictly "on grades," and that defendant's agent had seen the lumber in piles, and there made to some extent an inspection of it, and defendant had actually received two car loads, which, so far as appears, were a fair sample of the whole, the conclusion is easily reached that such words refer to lumber as piled in the yard, or "pile run," except as otherwise specified in the agreement; that the contract does not call for "C select and better," and "shop and flat," but for

the lumber piled for such classes, which defendant's agent
Green had looked over in plaintiff's yard at Merrill. If there
could otherwise be any doubt on this point, such doubt would
be easily resolved in plaintiff's favor from the use of the
words, "it also being understood that worthless mill cull
lumber is not to be accepted on this order." These signifi-
cant words, evidently used for a definite purpose, would have
no meaning if the preceding portion of the contract called
for classes known as "C select and better," and "shop and
flat." But, considering that the preceding part of the con-
tract called for the lumber piled for the classes mentioned,
and that the words were added so that worthless mill culls
found in the piles might be rejected, then their importance
is readily understood.

It follows that the contract called for the amount of lum-
ber mentioned therein, "pile run," from the piles that had
been pointed out to defendant's agent in the yards at Mer-
rill, Wis., exclusive of worthless mill culls, and defendant
was bound to receive the same, subject only to inspection in
respect to the dimensions mentioned in the contract, and
the rejection of such culls, and that the interpretation of the
agreement by the trial court was correct.

2. The next question is, Was there an implied warranty
that the lumber should be merchantable for defendant's use
at its factory?

It is undoubtedly the rule, as contended for by defendant,
that where manufactured articles are sold for a particular
purpose, and the purchaser does not have an opportunity
for inspection, but trusts to the judgment of the seller, there
is an implied contract that such articles will come within
the description of those contracted for, and be merchantable
for the particular purpose intended. *Merriam v. Field*, 24
Wis. 640; Benj. Sales, § 657. But when, as in this case, the
purchaser has had a fair opportunity for inspection, having
seen the property and actually received two car loads of the
same kind, and in making the purchase relies on his own

T. B. Scott Lumber Co. vs. Hafner-Lothman Mfg. Co.

judgment, and there is no fraud, the doctrine of implied warranty has no application. *Hight v. Bacon*, 126 Mass. 10, 30 Am. Rep. 639; *Bragg v. Morrill*, 49 Vt. 45; *Barr v. Gibson*, 3 Mees. & W. 390; *Jones v. Bright*, 5 Bing. 533.

3. Did the court err in allowing as damages $1 per thousand on the lumber which defendant refused to take?

The proper rule of damages in such cases is the difference between the contract price and the market price at the time of the breach. *Richardson v. Chynoweth*, 26 Wis. 656; *Hill v. Chipman*, 59 Wis. 211; *Osgood v. Bauder & Co.* 75 Iowa, 550; *Brownlee v. Bolton*, 44 Mich. 218. It is often said that, in case of a resale within a reasonable time, the measure of damages is the difference between the price obtained and the contract price; but this is upon the ground that the price so obtained is evidence against the original vendee of the market value, and that, if the sale is properly conducted, it fixes, as against him, the amount of the vendor's damages. It is more properly said that the price obtained at the resale is evidence of the market value. *Bigelow v. Legg*, 102 N. Y. 653; *Case v. Simonds*, 7 N. Y. Supp. 253. So the true rule is that, in an action for damages for the refusal on the part of the vendee to accept goods as agreed in his contract of purchase, the measure of damages is the difference between the market value of such goods at the time of the breach, and the price the vendee agreed to pay; and when a resale is made within a reasonable time, though made at auction, as in the case of *Bigelow v. Legg, supra*, the price obtained is evidence to be considered on the question of the market value at the time of such breach; and if a resale is made, and the evidence shows that all reasonable efforts were made to secure the best price obtainable, or that the price obtained was a fair one, it settles the question of the market value, so that the damages become liquidated. *Pollen v. Le Roy*, 30 N. Y. 549. It follows that the trial court in this case was not bound to be governed by the evidence of

resale.  Neither was the plaintiff bound to prove the market value by evidence of the resale.  The evidence produced of that character was competent and proper for consideration, but, inasmuch as it was not definite, the trial court very properly refused to be governed by it.  Presumably, the true rule was kept in mind,— that the controlling question is: What was the market value at the time of the breach? and, in that view, we think that the finding of $1 per thousand, as a difference between the contract price and such market value, is fairly supported by the evidence.  It is certainly not against the clear preponderance of the evidence.

It follows that the judgment of the circuit court should be affirmed.

*By the Court.*— The judgment of the circuit court is affirmed.